**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

FILED

OCT 2 7 2008

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

SUN KYUNG AHN, et al.,          )
    Plaintiffs,                )
                    )
            v.            )        **Case No. 1:08cv73**
                    )
**MERRIFIELD TOWN CENTER**       )
**LIMITED PARTNERSHIP,**         )
    Defendant.                 )

## MEMORANDUM OPINION

In this federal question suit, plaintiffs, purchasers of condominiums, sue the seller for rescission and damages pursuant to the Interstate Land Sales Full Disclosure Act ("ILSFDA"), 15 U.S.C. § 1701 *et seq.*, and various pendent state claims. Seller seeks dismissal, *inter alia*, of the ILSFDA claim on the ground that the seller's contractual promises to build the condominiums within two years of the date seller "ratified" the sales contracts exempts the transactions from ILSFDA.

At issue on summary judgment[1] with respect to the ILSFDA claim is whether the Act's exemption for land sales contracts containing promises to complete building within two years applies here where the sales contracts provide that building must òccur within two years of "ratification" of the contracts, defined as the date the seller signs the contracts, even though the purchasers signed the contracts and incurred obligations at a much earlier date. Put differently, the question is whether ILSFDA's two-year building exemption requires the two-year period to commence when a purchaser signs a sales contract and incurs obligations, or at some later date when a seller elects to sign or ratify

---

[1] Although the instant motion was filed as a motion to dismiss, it will be treated here as a motion for summary judgment pursuant to Rule 56, Fed. R. Civ. P., because information beyond the complaint's allegations has been considered. *See* Rule 12(c), Fed. R. Civ. P.

the contract.

For the reasons that follow, the contracts at issue here are not exempt from ILSFDA's reporting and disclosure requirements.

## I.[2]

Plaintiffs are twenty-nine individuals, all residents of Virginia, who contracted to purchase condominium units from defendant Merrifield Town Center Limited Partnership ("Merrifield"), a Virginia limited partnership. In 2005, Merrifield began planning development of the Vantage Condominiums at Merrifield Town Center in Falls Church, Virginia. To promote interest in the project, Merrifield hosted an open house and preview party in May 2005 for approximately 3500 potential buyers. Sales of the units commenced on June 2 and 3, 2005, and the entire project sold out by mid-July.

Merrifield used two contract forms, titled "Unit Purchase Agreements" ("UPAs") to sell its units: (i) one UPA form that required Merrifield to complete construction within 36 months of "ratification," defined in the UPA as the date Merrifield signed the UPA; and (ii) a second UPA form that obligated Merrifield to complete construction within 24 months of "ratification," also defined in the UPA as the date Merrifield signed the UPA. Only the second UPA form is at issue here, as all plaintiffs in this case signed 24-month UPAs in June or July 2005.

The UPAs signed by each plaintiff, as purchaser, required delivery of an "Initial Agreement Deposit" to Merrifield "upon Purchaser's execution of [the] Agreement," or in other words, the date each purchaser signed a UPA. UPA ¶ 2. The required deposit was either 5% of the purchase price in the event a purchaser intended to occupy the unit, or 10% of the purchase price in the event a

---

[2] The facts recited here are derived from the record as a whole and are essentially undisputed.

purchaser was an investor who intended to sell or lease the unit, not occupy it.[3] The UPAs required payment to the seller of a second deposit within 180 days of the date each purchaser signed a UPA. Failure to deliver the second deposit within the 180-day period triggered the UPAs' default provision, which provided that Merrifield could retain a purchaser's initial deposit in the event of purchaser default. Moreover, according to the terms of the UPAs, Merrifield was to hold each purchaser's deposits in a segregated escrow account pursuant to Va. Code § 55-79.95.[4] There is no claim by Merrifield that plaintiffs did not comply with these requirements; each plaintiff paid both deposits as required by the sales contracts.

The two deposit requirements were not the only obligations incurred by plaintiffs at the time they signed the UPAs in issue; additionally, plaintiffs, at the time they signed the UPAs, assumed two further obligations: (i) to make a written loan application to a lender within seven days of the date each purchaser signed a UPA, and (ii) to obtain financing approval and submit documentation of that approval within two weeks of the date each purchaser signed a UPA.[5] In the event a purchaser failed to comply with these loan application requirements, Merrifield could terminate the contract

---

[3] The difference in deposit amounts (5 or 10%) is not material to the ILSFDA exemption issue addressed here.

[4] Section 55-79.95 provides that "[a]ny deposit made in regard to any disposition of a unit, including a nonbinding reservation agreement, shall be held in escrow until delivered at settlement." Va. Code § 55-79.95(A). It further provides that "[s]uch escrow funds shall be deposited in a separate account designated for this purpose which is federally insured and located in Virginia . . . ." *Id.* The requirement of a "separate designated account," however, does not apply to Virginia-licensed real estate brokers and attorneys, acting as sellers, who maintain regular escrow accounts. *Id.* Moreover, § 55-79.95(A) provides that "[s]uch escrow funds shall not be subject to attachment by the creditors of either the purchaser or the [seller]." *Id.*

[5] In the event that a purchaser intended to buy without a loan, the UPAs also provided that such a purchaser was required to submit documentation demonstrating an ability to do so within five days of signing a UPA.

and refund to the purchaser any deposits already made. The UPAs also provided that a purchaser could, within ten days of receiving the "Public Offering Statement" required by the Virginia Condominium Act, Va. Code §§ 55-79.39 *et seq.*, cancel the contract and obtain a refund of the initial deposit without penalty. If a purchaser chose not to exercise this right to cancel, the contract was to "remain in full force and effect." UPA ¶ 11(b).

On signing the UPAs, the purchasers also made several representations reflected in the UPAs' various provisions, including that (i) "purchaser is contracting to purchase the property solely from [Merrifield] and not any affiliate of [Merrifield]," UPA ¶ 38; (ii) purchaser "waive[s] trial by jury in any action . . . with respect to any matter whatsoever relating in any way to this agreement," UPA ¶ 36; (iii) purchaser "acknowledges receipt of a copy of the Public Offering Statement [required under Virginia law] for the [c]ondominium," UPA ¶ 11; and (iv) purchaser either intends or does not intend to occupy the unit as a full-time residence. Finally, the first sentence of each UPA states, "This Condominium Unit Purchase Agreement . . . is made on _____, 200__, by and between" each purchaser and Merrifield. UPA at 1. In each UPA, the typed-in date matches each plaintiff's signing date.

Despite the obligations incurred by the purchasers upon signing, the UPAs' final paragraph also stated, in bold, capitalized letters:

> **Purchaser and [Merrifield] acknowledge that this agreement as signed by Purchaser or [Merrifield] alone does not constitute ratification of this agreement. This agreement shall not be binding upon [Merrifield] until executed by [Merrifield].**

UPA ¶ 39. This ratification provision is important because the UPAs also provided that Merrifield's obligation to build within two years—the obligation at issue for the ILSFDA question

-4-

presented—began on the date that Merrifield ratified each UPA. Specifically, the UPAs provided, "[Merrifield] acknowledges an absolute obligation to deliver the Unit no later than twenty-four (24) months from the date this Agreement is ratified." UPA ¶ 21(a). Finally, the UPAs provided that Merrifield's obligation to deliver the finished condominium units within 24 months was "absolute," except for "reasons outside of Declarant's control or as a result of the action or inaction of a third party whose actions are necessary to the performance of Declarant's obligations." *Id.*

As matters turned out, Merrifield did not ratify these UPAs at the time the purchasers signed them. For a variety of reasons, including difficulties during Summer 2005 in obtaining permit approval for construction, Merrifield intentionally delayed ratifying the 24-month UPAs by an average of 88 days.[6] Michael Collier, Merrifield's corporate designee pursuant to Rule 30(b)(6), Fed. R. Civ. P., acknowledged that Merrifield consciously chose to delay ratification "until [Merrifield] got some comfort level and certainty as to when [it was] going to get [its] site permits so [it] could proceed with construction." Pl. Supp. Mem., Ex. 16 at 21, l. 19–22.

In June 2006, Merrifield's development of the condominiums suffered more setbacks, including soil and environmental problems, weather delays, and delayed permit approvals. Accordingly, Merrifield sent plaintiffs an "amendment," in which plaintiffs could choose color schemes and other options for their condominiums. The amendment also stated, "The Agreement Ratification Date, as defined in the Agreement, is hereby amended to be the date of the execution by both parties of this Amendment." Pl. Am. Compl., Ex. 2 at 1. Most plaintiffs signed this amendment, and those who declined to do so were sent a letter which stated that mere receipt of the

---

[6] By contrast, Merrifield ratified the 36-month UPAs much more quickly—within an average of 31 days.

amendment signaled the purchaser's acknowledgment and acceptance of its terms. Accordingly, the amendment purported to extend the date by which Merrifield had to deliver the completed condominiums to June 2008, approximately 36 months after plaintiffs signed their UPAs, paid deposits, and obtained loans.

On January 25, 2008, several months before the extended settlement date, plaintiffs filed the complaint in this action, alleging that Merrifield failed to comply with the requirements of ILSFDA, including, *inter alia*, registration of the Vantage condominium development project with the U.S. Department of Housing and Urban Development ("HUD") and submission of various disclosures to plaintiffs at the time of purchase. Merrifield does not contend that it complied with the ILSFDA registration and disclosure provisions; rather, Merrifield argues that its contracts, by obligating Merrifield to build within two years of the extended ratification date, were exempt from ILSFDA. Plaintiffs also set forth several state law claims, including breach of contract, a cause of action under the Virginia Condominium Act, Va. Code § 55-79.39 *et seq.*, and a state claim for rescission. Merrifield moved to dismiss. This motion, now appropriately treated as a motion for summary judgment, has been fully briefed and argued and is now ripe for disposition.[7]

## II.

The sole question addressed here[8] is whether the UPAs Merrifield presented to plaintiffs, then signed by plaintiffs, and later ratified by Merrifield, qualify for ILSFDA's two-year building

---

[7] The parties agree that the material facts with respect to the application of the ILSFDA exemption are not disputed. Accordingly, the question is whether the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 324 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[8] The remaining issues raised in Merrifield's motion to dismiss will be addressed in a separate order.

exemption. If so, then Merrifield is entitled to partial summary judgment on this issue, and plaintiffs' ILSFDA claim must be dismissed, leaving only plaintiffs' remaining state claims for further litigation here or in a state forum.[9] On the other hand, if the UPAs do not qualify for the exemption, then because it is undisputed that Merrifield did not comply with ILSFDA's registration and disclosure requirements, plaintiffs will be entitled to partial summary judgment on their ILSFDA claim.

The ILSFDA provision at issue, 15 U.S.C. § 1702(a)(2), exempts from ILSFDA's registration and disclosure requirements those sales contracts in which the seller agrees to complete building of a dwelling within two years. Specifically, the exemption provides, in pertinent part, as follows:

> Unless the method of disposition is adopted for the purpose of evasion of this chapter, the [registration and disclosure] provisions of this chapter shall not apply to . . . the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years . . . .

15 U.S.C. § 1702(a)(2). As this language reflects, this ILSFDA provision does not specify when the mandatory two-year building requirement begins to run. Thus, the provision does not specify whether a sales contract, in order to qualify for the exemption, must obligate the seller to complete the dwelling within two years of the date the buyer signs the contract and incurs obligations, or whether it is sufficient for purposes of the exemption that the seller is only obligated to complete building the dwelling within two years of a later date when the date the seller chooses to ratify the sales contract. In other words, the exemption is silent on what event triggers the commencement of

---

[9] *See* 28 U.S.C. § 1367(c)(3) (permitting district courts to decline supplemental jurisdiction of state law claims where "the district court has dismissed all claims over which it has original jurisdiction"); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."), *cited in Mora v. City of Gaithersburg*, 519 F.3d 216, 231 (4th. Cir. 2008).

the mandatory two-year building requirement. And where, as here, a statute is silent on a matter important to its application, it is appropriate to examine the statute's purpose, its structure and its related provisions for clues as to Congress's intent on the matter.[10]

Congress's purpose in enacting ILSFDA provides a compelling reason to conclude that the triggering event for the two-year period is the buyer's signing of the sales contract and incurring of obligations under the contract. In other words, ILSFDA's purpose makes clear that Congress intended to exempt from ILSFDA only those sales contracts that require the seller to complete building within two years of the buyer's signing of the contract and incurring obligations. This follows from the widely-recognized fact that Congress enacted ILSFDA in response to "wholesale interstate land fraud" during the 1960s, in which "[u]nscrupulous promoters utilized a variety of schemes to unload undesirable realty," such as Florida swampland, onto "unsuspecting and ill-informed investors and consumers."[11] Accordingly, Congress designed ILSFDA to protect purchasers of land and to prohibit fraud in land sales by requiring sellers of land, *inter alia*, to make certain disclosures in advance of a purchaser's signing the sales contract. *See generally* 15 U.S.C. §§

---

[10] *See Adler v. Commissioner*, 86 F.3d 378, 380 (4th Cir. 1996) (explaining that courts "best implement the intent of Congress by construing the statute in a way that gives effect to its purpose"); *Baker, Watts, & Co. v. Miles & Stockbridge*, 876 F.2d 1101, 1105 (4th Cir. 1989) (looking to statute's structure and underlying purpose to determine congressional intent where provision in question was silent); *Lanza v. Sugarland Run Homeowners Ass'n*, 97 F. Supp. 2d 737, 740 (E.D. Va. 2000) (where statute is silent as to punitive damages, other provisions shedding light on the statute's "remedial scheme" are relevant to the statute's interpretation).

[11] James L. Olivier, Note, *Beyond Consumer Protection: The Application of the Interstate Land Sales Full Disclosure Act to Condominium Sales*, 37 U. Fla. L. Rev. 945, 946 (1985) (citing *Interstate Land Sales Full Disclosure Act, 1966: Hearings on S. 2672 Before the Subcomm. on Securities of the S. Comm. on Banking & Currency*, 89th Cong., 2d Sess. (1966)); *see also* William P. Sklar & Jennifer L. Dolce, *The Interstate Land Sales Full Disclosure Act's Two-Year Completion Exemption*, 73-FEB Fla. B.J. 56 (1999); 118 A.L.R. Fed. 647 (1994).

1701–1720 (requiring, *inter alia*, (i) filing of a public statement of record, §§ 1703(a)(1)(A), 1704–1706; and (ii) submission of a printed property report in advance of purchaser signing, §§ 1703(a)(1)(B), 1707).[12] Through ILSFDA's disclosure requirements, Congress intended to ensure that, "*prior to purchasing* certain types of real estate, a buyer [is] apprised of the information needed *to make an informed decision*." *Markowitz v. Ne. Land Co.*, 906 F.2d 100, 103 (3d Cir. 1990) (quoting *Cost Control Mktg. & Mgmt., Inc. v. Pierce*, 848 F.2d 47, 48 (3d Cir. 1988)) (emphases added).[13]

To be sure, Congress did not intend to subject *all* land sales to ILSFDA's disclosure and registration requirements; rather, Congress provided for certain exemptions, including § 1702(a)(2), to cover circumstances where the risk that a developer is attempting to sell essentially uninhabitable land to an unsuspecting buyer is so low that ILSFDA's registration and disclosure requirements are unnecessary to protect buyers. Importantly, these exemptions, including § 1702(a)(2), must be narrowly construed to ensure that Congress's essential purpose in enacting ILSFDA's remedial provisions is not frustrated. *See Olsen v. Lake Country, Inc.*, 955 F.2d 203, 206 (4th Cir. 1991) (recognizing that ILSFDA exemptions, like all exemptions from remedial statutes, "are to be construed narrowly"); *see also Markowitz*, 906 F.2d at 105 (same). Yet, precisely this would be the

---

[12] *See also* Conf. Rep. 90-1785 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 3053, 3066 ("The purpose of full disclosure is to deter or prohibit the sale of land by use of the mails or other channels of interstate commerce through misrepresentation of material facts relating to the property. A property report, which would include part of the statement of record, must be submitted to the purchaser who may revoke the contract if it is not submitted."), *cited in Winter v. Hollingsworth Props., Inc.*, 777 F.2d 1444, 1447 (11th Cir. 1985).

[13] *See also Law v. Royal Palm Beach Colony, Inc.*, 578 F.2d 98, 99 (5th Cir. 1978) (noting that ILSFDA "ensures that a buyer, *prior to purchasing* certain kinds of real estate, is informed of facts which will enable him to make an informed decision about purchasing the property" (emphasis added)); *Winter*, 777 F.2d at 1447; 54A Am. Jur. 2d Monopolies and Restraints of Trade § 1315.

result of construing § 1702(a)(2) as Merrifield argues here. To allow the two-year building period to commence on the occurrence of some future event chosen at the seller's discretion would allow sellers to extend the two-year building period indefinitely while still qualifying for an exemption. This would inappropriately sweep within the exemption's ambit the types of land sale situations Congress intended to be subject to, not exempt from, ILSFDA. It follows, therefore, that the sales contracts here in issue do not merit exemption from ILSFDA because the promise to build within two years is specified to run from the date the seller chooses to ratify the contract, rather than the date the buyer signs and incurs obligations.[14]

This conclusion finds firm support in related ILSFDA provisions and in the administrative interpretations of ILSFDA by HUD, the agency charged with implementing and enforcing ILSFDA. First, § 1703(a)(1)(B) makes it unlawful in *non-exempt* sales to "sell . . . any lot unless a printed property report . . . has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement *by such purchaser* . . . ." 15 U.S.C. § 1703(a)(1)(B) (emphasis added). In other words, in the case of non-exempt sales, § 1703(a)(1)(B) requires sellers to provide a purchaser with a printed property report *before* that purchaser makes the decision to sign a contract and incur obligations. In the event a seller fails to provide the purchaser with the required property report, § 1703(c) allows a purchaser to revoke the non-exempt contract within two years of the purchaser signing date, in which event the purchaser may, pursuant to § 1703(e), recover all deposits paid in

---

[14] Nothing in the result reached here is intended to suggest that Merrifield is engaged in the kinds of fraudulent sales activities that prompted Congress to enact ILSFDA. Yet, Congress did not confer on courts the plenary power to exempt from ILSFDA those transactions deemed by a court to be free of fraud; instead, Congress defined an exemption using language courts must narrowly construe and apply, and it is hardly surprising that some transactions free from fraud may nonetheless fail to qualify for the exemption.

connection with the revoked contract or agreement. 15 U.S.C. § 1703(c) ("[If] a property report is required . . . [but] has not been given to the purchaser . . . in advance of his or her signing such contract or agreement, such contract or agreement may be revoked at the option of the purchaser . . . within two years from the date of such signing . . . ."); § 1703(e) ("If a contract or agreement is revoked pursuant to subsection . . . (c), . . . such purchaser . . . shall be entitled to all money paid by him or her under such contract or agreement."). Taken together, these provisions reflect Congress's recognition that the need for buyer protection is critical prior to the time the buyer makes the decision to sign and incur obligations; accordingly, the seller must provide the property report before the buyer signs the contract so the buyer can make an informed decision.

In lieu of the right to receive information at signing, the purchaser in a contract *exempted* by § 1702(a)(2) is protected by the seller's obligation to build within two years. In other words, Congress viewed the seller's obligation to build within two years as an alternative to the important protections provided by §§ 1703(a)(1)(B) and 1703(c). To confer on sellers the power to extend the two-year period by delaying "ratification"—perhaps indefinitely—would allow sellers to engage in an end-run around ILSFDA's protections, a result plainly contrary to Congress's carefully crafted scheme to protect property purchasers. In sum, the only interpretation of § 1702(a)(2) that is consistent with Congress's statutory scheme is that reached here: The two-year building requirement of § 1702(a)(2) must begin on the date the purchaser signs the contract and incurs obligations.

HUD regulations interpreting ILSFDA provide further support for this result.[15] First, 24

---

[15] Because HUD is the agency responsible for enforcement of ILSFDA, its regulations "are entitled to *Chevron* deference as an authoritative interpretation of the statute unless . . . it appears from the statute or its legislative history that the agency's interpretation is not one that Congress would have sanctioned." *Danilov v. Aguirre*, 370 F. Supp. 2d 441, 444 (E.D. Va. 2005) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Asika v. Ashcroft*, 362

C.F.R. § 1710.5 (2006) interprets § 1702(a)(2)[16] as permitting inclusion of a "presale clause conditioning the sale of a unit on a certain percentage of sales of other units . . . if [that presale clause] is legally binding on the parties and is for a period not to exceed 180 days." 24 C.F.R. § 1710.5. Importantly, however, the inclusion of such a presale clause "cannot extend the 2-year period for performance[,] [and] . . . [t]he permissible 180 days is calculated from the date the first *purchaser signs* a sales contract in the project . . . ." *Id.* (emphasis added). Thus, HUD recognizes that a presale condition, while permissible, cannot operate to extend the two-year building obligation pursuant to § 1702(a)(2). In interpreting § 1702(a)(2) in this fashion, HUD plainly recognized the importance of preventing a seller from extending the two-year period by any contract provision or device. Indeed, it is hard to see the difference between a presale clause of the sort referred to in the regulation and a contract provision permitting the seller to delay signing or ratifying a sales contract. To allow either would permit a seller to avoid the important ILSFDA purchaser protections by the use of a contract provision that effectively extends the two-year building period.

Moreover, multiple regulations interpreting other ILSFDA provisions refer to purchaser signing as either the event before which a seller must provide the purchaser with information or the event that begins a time period within which a purchaser may exercise a right granted by ILSFDA.[17]

---

F.3d 264, 267–70 (4th Cir. 2004) (discussing *Chevron* deference)).

[16] Section 1710.5, as published, mistakenly refers to "exemptions . . . contained in § 1703" and to "§ 1703(a)(2)" as the specific exemption that § 1710.5 interprets, rather than § 1702, the section containing the exemptions, and § 1702(a)(2), the exemption it goes on to interpret. 24 C.F.R. § 1710.5.

[17] *See* 24 C.F.R. § 1710.11(a)(1)(i) (2006) (tying the two-year period for the obligation to build for purposes of the manufactured home exemption to "the date the purchaser signed the contract to purchase the lot"); § 1710.12 (a)(3)(iii) (intrastate exemption's requirement that an exempt contract have a non-waiveable purchaser right to revoke within seven calendar days of "the

These regulations, like § 1710.5, reflect HUD's consistent view that the moment at which a purchaser signs a sales contract and incurs obligations is the moment at which a purchaser should receive ILSFDA protection—either in the form of the seller's obligations to provide information before that moment, or alternatively, in the form of purchaser rights that exist as of that time.

More support for the result reached here is found in HUD's interpretive guidelines issued with respect to § 1702(a)(2).[18] Here, HUD's interpretive guidelines specifically reference § 1702(a)(2)'s exemption and state, "The two-year period normally begins on the date the purchaser signs the sales contract." Guidelines to the Interstate Land Sales Registration Program, 61 Fed. Reg. 13,596, 13,603 (March 27, 1996).[19] Further, these guidelines equate purchaser signing with the "sale"

---

date the purchaser signed" the contract); § 1710.13 (same requirement for Metropolitan Statistical Area exemption); § 1710.15(b)(8)-(9) (requiring seller to disclose information in a lot information statement "prior to the purchaser signing" in order to qualify for multiple site subdivision exemption); § 1710.117 (requiring amounts to be entered on a cost sheet "before the purchaser signs" in order to satisfy various reporting requirements); § 1710.212 (defining the "date of contract" for purposes of various exemptions to financial disclosure requirements as "the date on which the contract or agreement is signed by the purchaser"); § 1715.2 (providing for purchaser right to revoke certain non-exempt contracts within seven days of the "day that the purchaser signs a contract").

[18] An administrative agency's guidelines are interpretive rules entitled to "some deference" in the judicial interpretation of the agency's statute. *Reno v. Koray*, 515 U.S. 50, 61 (1995) (internal agency guideline, which is not "subject to the rigors of the Administrative Procedur[e] Act, including public notice and comment," is entitled to "some deference" (internal quotation marks omitted)); *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (noting that interpretations in opinion letters, like enforcement guidelines, are "'entitled to respect' . . . , but only to the extent that those interpretations have the 'power to persuade.'" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))).

[19] Merrifield argues that HUD's use of the word "normally" in this guideline anticipates exceptions to the general rule that purchaser signing starts the two-year clock. Of course, it is possible to imagine scenarios in which a sales contract might explicitly inform a purchaser that the purchaser has not incurred any legal obligations or that the purchaser's signature does not evidence any sort of binding commitment. Indeed, *Becherer v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 43 F.3d 1054 (6th Cir. 1995), discussed *infra*, may present such a case. But where, as here, nothing in the contract purports to inform the purchaser that he can withdraw at will—and, in fact, the

date of the property: "The essence of [§ 1702(a)(2)] is that it applies to the sale of a house (if not built at the time of the sale, then to be built within two years after the sale)." *Id.* Moreover, HUD interprets a "sale"—an event mentioned in § 1702(a)(2) but not specifically linked to the two-year period—to occur "when a purchaser signs a contract, even if the contract contains contingencies beyond the control of the seller." 61 Fed. Reg. at 13,602. Thus, HUD's interpretive guidelines appropriately reach the same result here, namely that § 1702(a)(2)'s two-year period, in order to guarantee that ILSFDA's reporting and disclosure requirements are not necessary to protect the purchaser's decision to sign, must run from the time that a purchaser signs and incurs obligations.[20]

These principles, applied here, compel the conclusion that the contracts entered into between plaintiffs and Merrifield were not exempt from ILSFDA. Plaintiffs signed the UPAs in June and July 2005, at which point they each immediately paid a deposit and incurred other obligations pursuant to their respective UPAs. At that point, plaintiffs, as purchasers, had already made the decision to buy the condominiums. Yet, the UPAs did not obligate Merrifield to construct the condominiums within two years of the purchasers making that decision, but instead allowed Merrifield to determine, unilaterally, when the two-year clock would begin to run. Accordingly, the UPAs in issue do not fall within § 1702(a)(2)'s exemption.

•

---

contract's language indicates the contrary—there is no reason to depart from the "normal" interpretation provided by HUD.

[20] It is worth noting that HUD's November 2, 2005 advisory opinion sent to Merrifield suggesting that the contracts may be exempt does not carry any weight here. The opinion clearly rests its conclusion that the two-year exemption applies on HUD's mistaken understanding that the contract "obligates the completion of construction within two years from the date the *purchaser signs* the . . . [c]ontract." (Emphasis added). Accordingly, because the contract does *not* so obligate Merrifield, the HUD opinion is based on a mistaken premise and is thus either irrelevant or, in basing its conclusion on purchaser signing starting the two-year period, actually lends further support to the result reached here.

The parties have cited no authority from this circuit or elsewhere that is directly on point, nor has any published authority been found squarely addressing the question decided here. And while there is but scant case law instructive on the question presented, what does exist also supports the result reached here. For example, the Eleventh Circuit, in *Winter v. Hollingsworth Properties, Inc.*, 777 F.2d 1444 (11th Cir. 1985), interpreted a companion clause [clause I][21] in § 1702(a)(2) in a manner that is instructive on the correct reading of the two-year building exemption at issue here. There, the seller sought exemption pursuant to clause I, which exempts sales of improved land upon which a building already exists. In this regard, the seller in *Winter* argued that even though the purchaser signed an agreement, the "sale" of the condominium did not occur until settlement, at which time the unit had been completed and a building existed on the lot, thereby qualifying for the exemption. *Id.* at 1449. The Eleventh Circuit easily rejected this sophistical argument, holding that the exemption did not apply because no building existed on the lot at the relevant time, namely at the time the purchaser signed the agreement and incurred obligations. The court observed that the exemption's requirement that a building exist on the lot at the time the purchaser signs the agreement and incurs obligations necessarily follows from ILSFDA's purpose of protecting consumers because,

---

[21] § 1702(a)(2), quoted in full, reads:

(a) Sale or lease of lots generally

Unless the method of disposition is adopted for the purpose of evasion of this chapter, the provisions of this chapter shall not apply to—

. . . (2) [clause I] the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building, [clause II] or the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years; . . .

consistent with that purpose, "the buyer must receive the information necessary to make his decision *prior* to the purchase commitment." *Id.* (citing *Law v. Royal Palm Beach Colony, Inc.*, 578 F.2d 98, 99, 100 (5th Cir 1978); *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1043–44 (10th Cir. 1980); 24 C.F.R. § 1710.1 (1985)) (emphasis added). Essentially, the court found that both of § 1702(a)(2)'s clauses present means by which a seller may provide a purchaser with information at "the time of contracting" that renders ILSFDA's reporting and disclosure requirements unnecessary to protect the purchaser's decision. *Id.* at 1450. ("If at the time the purchaser signs the contract there exists a condominium building or the seller is obligated to erect such a building within two years, the sale is exempt from the Act.") And because the purchaser in *Winter* did not have any such information—either in the form of a building already existing on the lot or in the form of an obligation on the seller to erect one within two years—ILSFDA's reporting and disclosure requirements applied. *Id.* Thus, *Winter*'s rationale compels the conclusion that the clock for § 1702(a)(2)'s two-year building requirement must begin to run at the time the purchaser signs and incurs an obligation under the sales contract.[22]

---

[22] It is worth noting that the Third Circuit, in *dicta*, agreed with this interpretation of *Winter* in *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir. 1990). Specifically, although the question presented in *Markowitz* was whether the contracts at issue actually "obligated" the seller to build within two years, the Third Circuit nonetheless observed, "We agree with the other circuits that have examined the issue that for purposes of the Act the sale occurs when the purchaser signs the sale agreement and incurs an obligation." 906 F.2d at 104 (citing *Yeomans v. Le Triomphe P'ship*, 884 F.2d 847, 849 (5th Cir. 1989); *Winter*, 777 F.2d at 1449; *Aldrich*, 627 F.2d at 1043–44). Similarly, in holding that the sales contracts in question did not obligate the seller to build within two years, the Third Circuit wrote that because the seller "was not obligated to erect the condominium within two years *of the sale date*[,] . . . [the] contract is not exempt . . . under § 1702(a)(2)." *Id.* at 106. It is not surprising, of course, that the Third Circuit included the words "of the sale date," because, for the reasons discussed here, starting the two-year period at another time would run counter to the purpose and structure of ILSFDA, as well as HUD's regulations and guidelines interpreting ILSFDA.

In opposition, Merrifield relies chiefly on *Becherer v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 43 F.3d 1054 (6th Cir. 1995), which, Merrifield claims, stands for the proposition that § 1702(a)(2)'s two-year period does not begin to run until both parties have signed an agreement. Merrifield's reliance on *Becherer*, however, is wholly misplaced. To begin with, the *Becherer* opinion Merrifield cites is merely one in a *Jarndyce v. Jarndyce*-like[23] like series of district court and Sixth Circuit opinions in that case,[24] the final result of which was the conclusion that ILSFDA did not apply at all to the contracts at issue because those contracts, which involved the sale of interests in hotel units, did not involve sales of "lots" as is necessary to come within ILSFDA's reach.[25] Thus,

---

[23] *See* Charles Dickens, *Bleak House* (1853) (*passim*).

[24] *See Becherer*, 193 F.3d 415, 418–20, 422 (6th Cir. 1999) (en banc) (summarizing the procedural history of the *Becherer* litigation, including, *inter alia*, three prior district court opinions and three Sixth Circuit panel decisions); *Becherer*, 799 F. Supp. 755 (E.D. Mich. 1992), *opinion supplemented on denial of reconsideration by Becherer*, 809 F. Supp. 1259 (E.D. Mich. 1992), *aff'd in part, vacated in part, and rev'd in part by Becherer*, 43 F.3d 1054 (6th Cir. 1995), *cert. denied sub nom. Adams v. Merrill Lynch, Pierce, Fenner, & Smith*, Inc., 516 U.S. 912 (1995) *and Becherer v. Adams*, 516 U.S. 912 (1995), *on remand to Becherer*, 920 F. Supp. 1345 (E.D. Mich. 1996), *aff'd in part by Becherer*, 127 F.3d 478 (6th Cir. 1997) *and Becherer*, No. 96-1673, 1997 WL 741361 (6th Cir. Dec. 3, 1997), *rev'd in part by Becherer*, 193 F.3d 415 (6th Cir. 1999).

[25] Although the Sixth Circuit initially agreed with the district court that none of the parties became legally bound until the closing of an interim escrow account,, the Sixth Circuit went on to remand the case for the district court to address two issues: (i) whether, in the first instance, ILSFDA "does not apply to the instant transaction because the hotel interests [at issue] are not 'lots' under the Act"; and (ii) whether, in the event that the hotel interests are "lots," and thus that ILSFDA applies, the contract provision at issue actually "obligated" the seller to build within two years. *Becherer*, 43 F.3d at 1068. On remand, the district court held that the units in question were not "lots," and thus that the transactions at issue were not subject to ILSFDA's reporting and disclosure requirements in the first instance. *Becherer*, 920 F. Supp. at 1353–55. It then went on to determine in the alternative that § 1702(a)(2)'s two-year exemption applied, relying both on its original holding that the two-year period ran from the time that both parties signed and incurred obligations under the contract and on its determination on remand that the contracts in question did in fact "obligate" the sellers to build, as "obligate" is defined by state contract law. *Becherer*, 43 F.3d at 1055–57. The Sixth Circuit affirmed the district court's determination that the units were not "lots" and thus were not subject to ILSFDA's requirements. As a result, the Sixth Circuit noted that "[b]ecause we have

the language relied upon by Merrifield, taken from the first of four Sixth Circuit opinions in that case, is—at best—mere *dicta*.

Moreover, even the Sixth Circuit's *dicta* in its first *Becherer* opinion is of little help to Merrifield, for the facts in *Becherer* differ significantly from those presented here. First, the "Unit Purchase Agreements" at issue in *Becherer*, unlike those at issue here, specifically obligated the seller to "substantially complete construction . . . not more than two years after this Agreement *becomes binding on the Purchaser* as such two-year period may be extended under [ILSFDA]." *Becherer*, 799 F. Supp. 755, 763 (E.D. Mich. 1992) (quoting the *Becherer* agreement) (emphasis added). Although the purchasers in *Becherer* paid deposits into an escrow account upon signing the agreements, the Sixth Circuit, in its initial opinion, agreed with the district court that the purchasers "were free to cancel their purchase agreements until two conditions were fulfilled: [the sales agent] received subscriptions for all units and [the financing company] approved each investor for financing." *Becherer*, 43 F.3d at 1058. Once those two conditions had been met, the purchasers in *Becherer* were bound to purchase the units, and their deposits were moved from an interim escrow account managed by the sales agent to a closing escrow account managed by a title guarantee company and to be released to the seller at final closing. *Id.*; *see also Becherer*, 799 F. Supp. at 762. The facts here are quite different; the UPAs signed by these plaintiffs did not measure Merrifield's two-year obligation from the date that purchasers became bound; rather, the UPAs here in issue timed the two-year obligation from "ratification." Similarly, the UPAs at issue here did not provide

---

found that the hotel units at issue here were not 'lots' within the meaning of [ILSFDA], the contested exemption *is irrelevant, and we need not address its applicability on appeal.*" *Becherer*, 127 F.3d at 482 (emphasis added). Thus, because the Sixth Circuit's ultimate holding was that ILSFDA did not apply, the language relied upon by Merrifield is pure *dicta*.

for a distinction between interim and closing escrow accounts, nor did they make clear in any way that the UPAs' provisions would not become binding *on the purchasers* until the fulfillment of certain future conditions.[26]

Merrifield counters by arguing, mistakenly, that plaintiffs did not incur any *obligations* upon signing—that by signing the UPA, depositing funds, and agreeing to take other steps to comply with the terms of the document, plaintiffs simply demonstrated the firmness and credibility of a purchaser-initiated *offer* to buy a condominium. Put simply, Merrifield argues that no contract existed between the parties until "ratification," or the date that Merrifield chose to sign the UPA, and that § 1702(a)(2)'s two-year time period does not begin to run until *after* contract formation. Until ratification, Merrifield argues, each plaintiff had a total and unfettered right to withdraw the deposits without penalty; accordingly, Merrifield contends, plaintiffs had not yet made the decision that ILSFDA seeks to ensure is an informed decision.

This argument is unpersuasive; it is contrary to the UPA's plain language. To be sure, the UPA states that the "agreement as signed by Purchaser or [Merrifield] alone does not constitute ratification of [the] agreement" and that the UPA "shall not be binding *upon [Merrifield]* until executed by [Merrifield]." UPA ¶ 39 (emphasis added). But importantly, this provision does *not* state that the UPA is not binding *on the purchaser* until Merrifield signs. To the contrary, the language in the UPA pertaining to multiple purchaser obligations clearly states that those obligations must be

---

[26] It is also worth noting that *Becherer*'s *dicta*, 43 F.3d at 1066–67, finding the HUD regulations interpreting § 1702(a)(2) to be unpersuasive is itself unpersuasive. The Sixth Circuit reached this conclusion on the ground that there was "substantial doubt" as to the applicability of a 1984 regulation, which had not been passed at the time the *Becherer* purchasers signed their agreements and which, although subsequently promulgated, was not "clearly retroactive." *Id.* (discussing 24 C.F.R. § 1710.5(b) (1984)). Unlike *Becherer*, there is no doubt that § 1710.5 is applicable here.

fulfilled, as they were by these plaintiffs, within a certain time of purchaser signing—*irrespective* of when Merrifield might choose to sign. Moreover, the UPA language imposing these obligations on plaintiffs certainly does not describe the obligations as mere steps a purchaser may take to demonstrate the credibility of a supposed offer to buy a unit; rather, the use of terms and phrases such as "default," "termination," and "remain in full force and effect" in describing the consequences of the purchaser's failure to meet these obligations suggests instead that plaintiffs, by signing the UPA, incurred binding contractual obligations, the breach of which would allow Merrifield to retain plaintiffs' deposits. Likewise, Merrifield's choice of the term "ratification" further suggests that the purchaser's execution of the UPA triggered purchaser obligations. In a context such as this, "ratification" typically means "[c]onfirmation . . . of a previous act, thereby making the act *valid from the moment it was done." Black's Law Dictionary* (8th ed. 2004) (emphasis added). Merrifield, by using the word "ratification" to describe its unilateral option to delay its signature until a time of its choosing, demonstrated that it was aware that its signature merely confirmed what had already occurred at the moment the purchaser signed, namely formation of a binding sales contract.[27]

Equally unpersuasive is Merrifield's attempt to equate the UPAs with non-binding reservation agreements, which HUD guidelines suggest do not trigger ILSFDA's requirements. The HUD guidelines define such a reservation agreement as "a non-binding agreement used to gauge market feasibility for a developer through which a potential purchaser expresses an interest to buy or lease a lot or unit at some time in the future." 61 Fed. Reg. at 13,602. This certainly does not describe the UPAs in issue, which were binding sales contracts. Nor can a reservation agreement

---

[27] In addition, the representations made by plaintiffs at signing—which included, *inter alia*, representations regarding intent to occupy the unit, acknowledgment of having received a public offering statement, and waiver of jury trial rights—were clearly binding on plaintiffs.

become a sales contract by virtue of some future event occurring at seller's discretion. As the HUD guideline puts it, "In no case may a reservation become a binding obligation to purchase a lot; the potential *purchaser must take some subsequent affirmative action, typically the signing of a sales contract*, to create a binding obligation." *Id.* at 13,603.

Merrifield finally argues that under Virginia state law—specifically, its statute of frauds, Va. Code § 11-2—no contract in real estate can be formed except by a writing signed by both parties. Of course, § 11-2 only requires that "any contract for the sale of real estate" be "in writing and signed *by the party to be charged*" before the party to be charged can be subject to an action by the other party. Va. Code § 11-2; *see also* 4A Michie's Jurisprudence, Contracts § 13 at 414 (2007) ("It is not necessary that all the parties to a contract should sign it to be bound thereby. The signing of one party only is sufficient, provided that party be the one sought to be charged.") Because the important question is whether or not the *purchaser* has incurred an obligation, it is important to note that Merrifield, consistent with § 11-2, could have brought an action against any of the plaintiffs as "the party to be charged" to enforce the plaintiffs' obligations because *plaintiffs had signed the UPA*.[28]

In sum, although the UPA obligated Merrifield to complete construction within two years of the date it chose to "ratify" the UPA, the UPA did not obligate Merrifield to complete construction

---

[28] *See Reynolds v. Dixon*, 187 Va. 101, 106–07 (1948) (citing *Croghan v. Worthington Hardware Co.*, 115 Va. 497 (1913)) (noting that a writing evidencing a contract for sale of real estate "need be signed *only by the party to be charged thereby*," and not both parties to the contract, for the contract to be enforceable against the party that signs the writing (emphasis added)); *see also GE Supply, Div. of Gen. Elec. Co. v. Thomas*, Nos. 94-1395, 94-1559, 1995 WL 456339, at *4 (4th Cir. Aug. 3, 1995) (rejecting the argument that § 11-2 requires signatures by both parties to a guaranty contract because "the law is well settled that only the signature of the party against whom the agreement is being enforced is required").

within two years of the date that plaintiffs signed and incurred various obligations. Accordingly, the contracts at issue fall outside the scope of § 1702(a)(2)'s exemption[29] and are thus subject to ILSFDA's reporting and disclosure requirements.

For these reasons, plaintiffs are entitled to partial summary judgment on the issue of whether ILSFDA's reporting and disclosure requirements apply to the contracts in question.

An appropriate Order will issue.

Alexandria, Virginia
October 27, 2008

_____  /s/
T. S. Ellis, III
United States District Judge

---

[29] The parties devote substantial effort to plaintiffs' alternative argument that even if § 1702(a)(2)'s two-year period runs from ratification, Merrifield's use of the ratification device in these contracts was adopted "for purpose of evasion" of ILSFDA's requirements, and thus the contracts are still subject to ILSFDA's reporting and disclosure requirements. *See* § 1702(a) (providing that § 1702(a)(2)'s exemption does not apply where "the method of disposition is adopted for the purpose of evasion of this chapter"). Plaintiffs contend that, *inter alia*, (i) by timing the two-year building obligation from the ratification date, (ii) by intentionally delaying ratification, and (iii) by presenting an amendment to purchasers that purported to extend that date even further, Merrifield acted with the prohibited purpose of evading ILSFDA's requirements. In response, Merrifield argues that it simply sought to avail itself of the exemption by complying with § 1702(a)(2)'s requirements, and that the "purpose of evasion" restriction in § 1702(a) is designed to prevent only fraudulent seller actions that are not present here. The Eighth Circuit has addressed the "purpose of evasion" language of § 1702(a) and concluded that merely taking good faith steps to qualify for an exemption is insufficient to constitute a "purpose of evasion"; rather, fraudulent intent in the use of the exemption is required. *Atteberry v. Maumelle Co.*, 60 F.3d 415, 421 (8th Cir. 1995). While this reasoning has some force, it is, in the end, unnecessary here to reach or decide this issue because plaintiffs' UPAs are not exempt from ILSFDA.